**UNITED STATES DISTRICT COURT**
**NORTHER DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| Rosalind Hudson-Battie, Individually And On Behalf Of All Others Similarly Situated, | Case No.: _____ |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | <u>JURY TRIAL DEMANDED</u> |
| ARC AUTOMOTIVE, INC., GENERAL MOTORS LLC, HYUNDAI MOTOR GROUP, HYUNDAI MOTOR COMPANY, HYUNDAI MOTOR AMERICA, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

NATURE OF CLAIMS ............................................................................................ 4

THE PARTIES .......................................................................................................... 5

I.      ARC DEFENDANT ..................................................................................... 5

II.     VEHICLE MANUFACTURER DEFENDANTS ........................................ 6

III.    PLAINTIFFS ............................................................................................... 7

JURISDICTION AND VENUE .............................................................................. 8

        I.      Personal Jurisdiction – The ARC Defendant ................................... 9

II.     PERSONAL JURISDICTION – GENERAL MOTORS ........................... 10

III.    PERSONAL JURISDICTION – HYUNDAI MOTOR GROUP ............... 12

        A.      Hyundai Motor Group ..................................................... 12

        B.      Hyundai Motor Company ................................................ 14

        C.      Hyundai Motor America ................................................. 15

GENERAL FACTUAL ALLEGATIONS .............................................................. 15

I.      DEFINITIONS .......................................................................................... 15

II.     ARC IS A MAJOR MANUFACTURER OF AIRBAG INFLATORS ....... 16

III.    ARC'S DEFECTIVELY DESIGNED AND MANUFACTURED INFLATORS .......... 17

        A.      ARC's Poor and Dangerous Design And Production Process ............ 17

        B.      ARC's Deficient Manufacturing and Quality Control ..................... 23

IV.     ARC INFLATOR FAILURES AND DEFENDANTS' INADEQUATE
        REACTION ............................................................................................... 25

        A.      Early Injuries and Deaths Spur Investigation ..................... 25

        B.      Ongoing NHTSA Investigation ...................................... 26

        C.      Mounting Deaths And Belated Recalls ............................ 30

V.      DEFENDANTS' INADEQUATE RECALLS AND FAILURE TO ASSIST
        IMPACTED CONSUMERS ...................................................................... 39

TOLLING OF THE STATUTE OF LIMITATIONS .............................................. 39

FRAUDULENT CONCEALMENT ....................................................................... 39

ESTOPPEL .............................................................................................................. 40

DISCOVERY RULE ............................................................................................... 40

CLASS ACTION ALLEGATIONS ........................................................................ 40

THE NATIONWIDE CLASS .................................................................................. 41

# TABLE OF CONTENTS
## (continued)

Page

THE STATE CLASS ........................................................................................... 41

NUMEROSITY AND ASCERTAINABILITY ........................................... 42

PREDOMINANCE OF COMMON ISSUES ............................................... 42

TYPICALITY ................................................................................................... 45

ADEQUATE REPRESENTATION ............................................................... 45

SUPERIORITY ................................................................................................. 45

REALLEGATION AND INCORPORATION BY REFERENCE ............ 48

CLAIMS FOR RELIEF ................................................................................... 48

I.      STATE-LAW CLAIMS AGAINST ARC AUTOMOTIVE, INC. ............................... 48

COUNT 1 FRAUDULENT CONCEALMENT ........................................... 48

COUNT 2 BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ..................... 51

COUNT 3 .......................................................................................................... 52

COUNT 4 .......................................................................................................... 54

II.     STATE-LAW CLAIMS AGAINST THE VEHICLE MANUFACTURER
        DEFENDANTS ................................................................................... 54

COUNT 5 FRAUDULENT CONCEALMENT ........................................... 54

COUNT 6 BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ..................... 57

COUNT 7 .......................................................................................................... 58

NEGLIGENT MISREPRESENTATION ...................................................... 58

COUNT 8 UNJUST ENRICHMENT ............................................................ 60

PRAYER FOR RELIEF .................................................................................. 61

DEMAND FOR JURY TRIAL ...................................................................... 62

Plaintiffs, based on personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, allege as follows:

## INTRODUCTION

1.      Airbags are a critical component in the safety features of virtually every motor vehicle sold in the United States and throughout the world.

2.      The Intermodal Surface Transportation Efficiency Act of 1991 mandates that all passenger automobiles and light trucks built for the United States market after September 1, 1998 be equipped with airbags installed as standard equipment for both the driver and front passenger.

3.      The Federal Motor Vehicle Safety Standards, detailed in 49 CFR § 571.208, codifies the requirements for occupant crash protection with which a manufacturer is required to comply in the production of passenger vehicles.

4.      In order to prevent serious injury and death resulting from bodily impact with hard interior surfaces of automobiles, such as windshields, steering columns, dashboards, video screens, and pillars, upon a vehicle experiencing a specified change in velocity in a collision, accelerometers and sensors, which are components of the occupant restraint system, trigger the deployment of vehicle airbags. Because collisions can occur at rates of speed that can cause serious injury, to be effective, airbags must deploy timely and at appropriate velocity to be effective, but not subject the occupant to additional unnecessary harm. To accomplish this, airbag systems such as the system installed into the Class Vehicles use an explosive charge to rapidly inflate the airbags upon being triggered.

5.      The following illustration, depicts the basic layout of the locations of components of the driver's side airbag system:



6.      When people operate a motor vehicle or ride in one as a passenger, they trust and rely on the manufacturers of those motor vehicles and the occupant restraint system components to make those vehicles safe.

7.      Manufacturers must take all necessary steps to ensure that the safety components installed in vehicles—which can mean the difference between life and death in an accident—function as designed, specified, promised, and intended.

8.      ARC Automotive Inc. is a leading manufacturer of airbag inflators, a critical safety device in all modern motor vehicles. Airbag modules containing ARC Automotive Inc. hybrid inflators are installed in at least 30 million vehicles in the United States and everyday millions of people utilize these vehicles, by necessity, to carry-out their daily lives. They do so because they have no choice and in many cases they do so unaware that an act as simple as driving to work, driving to the grocery store, or driving to baseball practice, exposes them and their passengers to a hidden and potentially fatal defect lurking within the airbag module containing an ARC hybrid inflator.

9.      Since at least July of 2015, Defendants have been aware of an issue concerning hybrid inflators manufactured by ARC Automotive Inc. due to an ongoing National Highway Traffic Safety Association ("NHTSA") investigation into reports of ruptured inflators that had dispersed shrapnel, injuring or even killing vehicle occupants.

10.     Defendants should have been aware of the defective inflators from internal testing and from reports concerning incidents such as the incident which occurred when Lois Dutton was involved in a low speed collision as she turned in to her driveway.

11.     In an interview, Ms. Dutton stated that she "saw a cloud of white smoke and a flash of white" as the airbag inflator ruptured upon impact. Shrapnel sliced through an artery in her neck, and she passed out. "It looked like someone had shot a gun at the windshield," she said.

12.     The inflator in Ms. Dutton's vehicle was manufactured by ARC Automotive Inc. and present in a Class Vehicle manufactured and sold by FCA.[1]

13.     Since no later than 2015, the Vehicle Manufacturer Defendants have been well aware of the risks ARC Automotive Inc. takes with its production process and lacking quality control measures during the manufacture of its hybrid inflators.

14.     Despite this knowledge, ARC Automotive Inc. continued to manufacture millions of inflators and the Vehicle Manufacturer Defendants continued to purchase millions of inflators for installation into Class Vehicles.

15.     Additionally, ARC Automotive Inc. continued to advertise and sell these inflators to members of the Class all while failing to implement either a design change or process and quality control changes to eliminate the excess weld flash present in the defective inflators.

---

[1] *See* Hiroko Tabuchi, NEW YORK TIMES, Airbag Flaw Investigated at ARC Automotive (July 15, 2015), available at https://www.nytimes.com/2015/07/15/business/airbag-flaw-investigated-at-arc-automotive.html.

16.     This Inflator Defect has caused at least 2 deaths and 4 injuries, all of which are attributable to these inflators rupturing.

17.     This action seeks, to the extent it can, some measure of justice for those who have been harmed by the illegal and tortious acts described in this complaint. It seeks both compensatory and punitive damages in an amount reflective of the egregious nature of the defendant's conduct. It also seeks injunctive relief to compel ARC Automotive, Inc. and the Vehicle Manufacturer Defendants to take immediate and effective action to either (1) replace all of the defective airbag modules with airbag modules that do not contain inflators with the friction weld flash defect, or (2) immediately institute a re-purchase program to take all of the unsafe class vehicles off the road.

## NATURE OF CLAIMS

18.     This action concerns defective inflators manufactured by Defendant ARC Automotive, Inc. and its related entities ("ARC"), and installed in vehicles manufactured and distributed by General Motors LLC, Hyundai Motor Group, Hyundai Motor Company, Hyundai Motor America, and their related entities (collectively the "Vehicle Manufacturer Defendants").

19.     As a result of a defective design and defective manufacturing process resulting in a common, uniform defect—the presence of excess friction weld flash inside the inflators—instead of protecting vehicle occupants from bodily injury during accidents, the Defective Airbag Modules too often violently explode and rupture, expelling metal debris and shrapnel at vehicle occupants.

20.     The inflators in the Class Vehicles suffer from a design defect as follows: the design of the inflators fails to account for the excess, asymmetrical weld flash which is a byproduct of the friction welding process that is required to manufacture these inflators according to ARC's design. During manufacture of these inflators, the friction welding process creates excess, asymmetrical weld flash at the interface between the inner diameter of the support tube and the upper pressure vessel. During deployment of the inflator during an accident, a portion of this excess, asymmetrical

weld flash can become dislodged. If the dislodged weld flash is not large enough to block the gas exit orifice, this weld flash will exit the inflator through the gas exit orifice. If the dislodged weld flash is sufficiently large, it will lodge in the gas exit orifice, resulting in an increase of pressure in the inflator housing, and causing a rupture ("Inflator Defect" or "Defect").

21.     As a result of Defendants' misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages. The Defective Airbag Modules containing the Inflator Defect significantly diminish the value of the cars in which they are installed.

22.     Plaintiffs and the Classes did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the defects been disclosed.

## THE PARTIES

### I.    ARC Defendant

23.     Defendant ARC Automotive, Inc. ("ARC") is a Delaware corporation, with manufacturing facilities in Morgantown, Kentucky and Hartsville, Tennessee, among others. ARC is a global manufacturer that produces a full complement of inflators for automotive airbag applications. ARC can be served through its registered agent, The Corporation Trust Company, 1209 Orange Street, Corporation Trust Center, Wilmington, DE 19801. ARC delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Georgia.

24.     ARC was acquired and is wholly-owned by the Yinyi Group as of 2016. The Yinyi Group is a large group corporation with business in real estate development, resource industry, new materials and technologies development, domestic and international trade, property management, logistics, warehousing, construction material and five-star hotels. Yinyi maintains its headquarters at 27th Floor, Bund Building, No. 132 Renmin Road Jiangbei District Ningbo, Zhejiang, 315020, China.

25.     Defendant ARC is the manufacturer of all the faulty airbags recalled by the NHTSA that are the subject of this Complaint.

## II.    Vehicle Manufacturer Defendants

26.     General Motors LLC ("General Motors LLC") is organized in Delaware and maintains its executive offices at 300 Renaissance Center, Detroit, Michigan. The sole member of General Motors LLC is General Motors Holdings LLC.

27.     Defendant Hyundai Motor Group is a general partnership composed of, *inter alia*, Hyundai Motor Company, Kia Corporation, and Hyundai Mobis Co., Ltd..

28.     Defendant Hyundai Motor Company ("HMC") is a South Korean multinational automotive manufacturer headquartered at 12 Heolleung-Ro, Seocho-Gu, Seoul, 06797 South Korea.

29.     Defendant Hyundai Motor America ("HMA") is a California corporation with its principal place of business at 10550 Talbert Ave, Fountain Valley, California. HMA is subsidiary of HMC, a South Korea-based company.

30.     Defendants HMA and HMC are collectively referred to as "Hyundai" or "Hyundai Defendants." Hyundai vehicles sold in the United States contain defective Inflators manufactured by the ARC Defendants. The Hyundai Defendants deliver these products into the stream of

commerce with the expectation that they will be purchased by consumers in the United States and the State of Georgia.

31.     All of the non-ARC OEM Defendants are collectively referred to as the "Vehicle Manufacturer Defendants." For the sake of clarity, the Vehicle Manufacturer Defendants are General Motors LLC, Hyundai Motor Group, Hyundai Motor Company, and Hyundai Motor America.

### III.   **Plaintiffs**

32.     Plaintiff Rosalind Hudson-Battie ("Plaintiff") is an individual residing in Stone Mountain, Georgia. Plaintiff purchased a 2005 GMC Yukon 1500, VIN 1GKEC13V45J226638 (for purposes of Plaintiff's allegations, the "Yukon Class Vehicle") for personal, family, and/or household use in 2006. At the time, Plaintiff reasonably expected that the airbags in the Class Vehicle would not contain a safety defect.

33.     Plaintiff purchased a 2005 Chevrolet Avalanche, VIN 3GNEC12Z55G198311 (for purposes of Plaintiff's allegations, the "Avalanche Class Vehicle") for personal, family, and/or household use in 2006. At the time, Plaintiff reasonably expected that the airbags in the Class Vehicle would not contain a safety defect.

34.     Plaintiff purchased a 2009 Hyundai Genesis, VIN KMHGC46E19U039732 (for purposes of Plaintiff's allegations, the "Genesis Class Vehicle") for personal, family, and/or household use on or around on October 18, 2016. At the time, Plaintiff reasonably expected that the airbags in the Class Vehicle would not contain a safety defect.

35.     Plaintiff had no way of knowing the Class Vehicle contained the Inflator Defect that could cause. To the contrary, before acquiring the each of the Class Vehicles, the Yukon Class Vehicle, the Avalanche Class Vehicle, and the Genesis Class Vehicle, Plaintiff viewed or heard

commercials and reviews through television, radio, and/or the internet that touted the safety and reliability of the Class Vehicle. Defendants concealed the existence of the Inflator Defect from Plaintiff and consumers. Plaintiff would not have purchased the Class Vehicle, or would have paid less for it, if Defendants did not conceal material information about the Inflator Defect and as a result, the value of Plaintiff's Class Vehicle has diminished.

## JURISDICTION AND VENUE

36.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Also, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiffs' MMWA claims arise under federal law, and this Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

37.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, the Defendants have caused harm to class members residing in this District, and the Defendants are residents of this District under 28 U.S.C. 1391(c)(2) because they are subject to personal jurisdiction in this district. Also, venue is proper in this district pursuant to 18 U.S.C. § 1965.

38.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 (a)-(c). Each Defendant does substantial business in Georgia and within this District, and each maintains requisite minimum contacts with Georgia.

39.    Furthermore, venue is proper in this District because, like many other class members, significant and material aspects of the transactions relating to Plaintiffs' purchase of their Class Vehicles occurred within and were otherwise connected to this District.

40.     ARC and the Vehicle Manufacturer Defendants distribute the vehicles equipped with the Defective Inflators in this District and receive substantial compensation and profits from the sale, service, and use of vehicles equipped with the Defective Inflators in this District, and each Defendant's misconduct occurred within this District so as to subject each to this Court's personal jurisdiction.

41.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants, because they conduct substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and at or about the time of such injuries Defendants were engaged in solicitation or service activities within this state or products, materials, or things processed, serviced, or manufactured by Defendants anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

## I.    <u>Personal Jurisdiction – The ARC Defendant</u>

42.     This Honorable Court has personal jurisdiction over Defendant ARC Automotive, Inc. ("ARC") a foreign corporation because it receives substantial compensation and profits from the sale of the Defective Inflators intended for vehicles sold in this District and has and continues to conceal and make material omissions in this District so as to subject it to in personam jurisdiction in this District.

43.     ARC conducts substantial business in the state of Georgia such that it should anticipate being haled into Court here, because its acts and/or omissions and the consequences

thereof resulted in tortious injury to the Plaintiffs in this state, and because some of the actions giving rise to this Complaint took place in this state.

44.    Upon information and belief, ARC maintains contractual relationships with the Vehicle Manufacturer Defendants to supply component parts with the intent they be installed and sold in Class Vehicles, including sales to Vehicle Manufacturer Defendants manufacturing and assembling vehicles in Georgia and others with a network of dealerships in Georgia.

45.    ARC's factories in Knoxville, Tennesse; Morgantown, Kentucky, and McAllen, Texas have repeatedly consigned shipments that arrived through the Port of Savannah. These shipments contained airbag inflator components described as "Airbags Parts," "Safety or Detonating Fuse," "Substances Explosives," "Igniter Body," "Igniter Body Generant Cover," "Igniter Body Generant," "Steel Caps for Airbag," "Energetics Cover," and "Automotive Parts". As the consignee, ARC takes possession of the goods at the port of entry and arranges for their transport to the ARC facilities. Thus, ARC has conducted substantial business in Georgia and has afforded itself to the protection of Georgia laws.

## II.    Personal Jurisdiction – General Motors

46.    This Honorable Court has personal jurisdiction over Defendant General Motors LLC ("General Motors LLC") a foreign corporation because it conducts substantial business in the state of Georgia such that it should anticipate being haled into Court here, has an agent in the state of Georgia, sells its vehicles in Georgia through a dealership network with the intent that its vehicles would be purchased and used in Georgia, maintains websites in which Georgia residents can communicate with General Motors LLC, corresponds with Georgia residents with respect to recalls, warranty issues, and technical service bulletins, because its acts and/or omissions and the

consequences thereof resulted in tortious injury to the Plaintiffs in this state, and because some of the actions giving rise to this Complaint took place in this state.

47.     This Honorable Court has personal jurisdiction over Defendant General Motors Holdings LLC ("General Motors Holdings") a foreign corporation because it conducts substantial business in the state of Georgia such that it should anticipate being haled into Court here, is the sole owner of General Motors LLC, because its acts and/or omissions and the consequences thereof resulted in tortious injury to the Plaintiffs in this state, and because some of the actions giving rise to this Complaint took place in this state.

48.     This Honorable Court has personal jurisdiction over Defendant General Motors Company ("General Motors Parent") a foreign corporation because it conducts substantial business in the state of Georgia such that it should anticipate being haled into Court here, is the sole owner of General Motors Holdings, because its acts and/or omissions and the consequences thereof resulted in tortious injury to the Plaintiffs in this state, and because some of the actions giving rise to this Complaint took place in this state. This includes all sales of the GM-branded Class Vehicles manufactured by General Motors Parent containing defective Inflators manufactured by the ARC Defendants.

49.     General Motors LLC submitted itself to the jurisdiction before this Court through its pervasive marketing and purposeful cultivation of profitable relationships with customers, dealerships, service facilities, and other individuals and entities throughout Georgia.

50.     General Motors LLC has been registered to do business in the State of Georgia since its creation in 2009. General Motors LLC's registered agent for service is CSC of Cobb County, Inc. at 192 Anderson Street SE, Suite 125, Marietta, GA, 30060.

### III.    Personal Jurisdiction – Hyundai Motor Group

#### A.    Hyundai Motor Group

51.    This Honorable Court has personal jurisdiction over Defendant Hyundai Motor Group a foreign partnership because it conducts substantial business in the state of Georgia such that it should anticipate being haled into Court here, has an agent in the state of Georgia, because its acts and/or omissions and the consequences thereof resulted in tortious injury to the Plaintiffs in this state, and because some of the actions giving rise to this Complaint took place in this state. This includes all sales of the Hyundai-branded Class Vehicles manufactured and shipped to the United States by Hyundai Motor Corporation containing defective airbag modules manufactured by Hyundai Mobis Co., Ltd. containing Defective Inflators manufactured by the ARC Defendants.

52.    Hyundai Motor Group is a partnership of multiple corporations including, Hyundai Motor Company, Kia Motors Corporation, and Hyundai Mobis Co., Ltd.

53.    Hyundai Motor Company, Kia Motors Corporation, and Hyundai Mobis Co., Ltd. are all each partners within the Hyundai Motor Group acting as both principals and agents to each other and to the partnership.

54.    The Hyundai Motor Group has embraced a management philosophy which claims to have an "Unlimited Sense of Responsibility."

55.    Specifically, Hyundai Motor Group claims to have a management philosophy which carries "[a]n unlimited sense of responsibility for our customers' safety and happiness [which] is manifested in quality management and extends to the ideal of creating greater value for society at large."[2]

---

[2] *Management Philosophy*, HYUNDAI MOTOR GROUP,
https://www.hyundaimotorgroup.com/about-us/CONT0000000000002733 (last visited July 21, 2022).

56.    The Hyundai Motor Group partnership is solidified by a series of cross holdings, including:

a.    Kia Corporation owns approximately 17.33% of Hyundai Mobis Co., Ltd;

b.    Hyundai Mobis Co., Ltd. owns approximately 17.28% of Kia Corporation;

c.    Hyundai Mobis Co., Ltd. owns approximately 21.43% of Hyundai Motor Company; and

d.    Hyundai Motor Company owns approximately 33.88% of Kia Corporation.

## "Hyundai Motor Group" Structure



57.    The Hyundai Motor Group collectively designs and builds Kia and Hyundai vehicles, integrating component parts from Hyundai Mobis, including ARC sourced inflators, and distributes these vehicles and parts globally, including to the State of Georgia.

58.    Hyundai Motor Group is subject to personal jurisdiction within the State of Georgia because its members, acting as both principals and agents, have transacted business in the State of Georgia, have contracted to supply vehicles and Defective Inflators in the State of Georgia, have produced, manufactured, and distributed vehicles and Defective inflators with the reasonable expectation that the vehicles and Defective inflators would be used in the State of Georgia.

13

59.    Hyundai Motor Group is subject to personal jurisdiction within the State of Georgia because its members are subject to personal jurisdiction within the State of Georgia.

60.    Hyundai Motor Group has been registered to conduct business in the State of Georgia since June of 2022. Hyundai Motor Group's registered agent for service is CT Corporation System, 289 S. Culver Street, Lawrenceville, Georgia, 30046.

### B.    Hyundai Motor Company

61.    This Honorable Court has personal jurisdiction over Defendant Hyundai Motor Company ("HMC") a foreign corporation because it conducts substantial business in the state of Georgia such that it should anticipate being haled into Court here, has an agent in the state of Georgia, because its acts and/or omissions and the consequences thereof resulted in tortious injury to the Plaintiffs in this state, and because some of the actions giving rise to this Complaint took place in this state. This includes all sales of the Hyundai-branded Class Vehicles manufactured and shipped to the United States by Hyundai Motor Corporation containing defective Inflators manufactured by the ARC Defendants.

62.    Hyundai Motor Company owns approximately 33.88% of Kia Corporation.

63.    Hyundai Motor Company is the sole owner of Hyundai Motor America.

64.    Hyundai Motor Company's stated business purposes include (1) the manufacture and sale of all kinds of vehicles, (2) engaging in the import and export business, (3) wholesale of vehicle parts and automobile supplies, (4) engaging in the development and sales of resources overseas, and (5) to operate all related businesses. Hyundai Motor Company's charter specifically allows that it may establish factories, branch offices, or sub-branch offices away from its home location.

14

65.     Hyundai Motor Company has furthered its business model by reaching into Georgia and routinely delivers shipments of its products, including automobile service parts such as replacement airbags, through the Port of Savannah from its partner entities, including Mobis Parts America, LLC.

### C.    Hyundai Motor America

66.     This Honorable Court has personal jurisdiction over Defendant Hyundai Motor America ("HMA") a foreign corporation because it conducts substantial business in the state of Georgia such that it should anticipate being haled into Court here, has an agent in the state of Georgia, sells its vehicles in Georgia through a dealership network with the intent that its vehicles would be purchased and used in Georgia, maintains websites in which Georgia residents can communicate with Hyundai Motor America, corresponds with Georgia residents with respect to recalls, warranty issues, and technical service bulletins, because its acts and/or omissions and the consequences thereof resulted in tortious injury to the Plaintiffs in this state, and because some of the actions giving rise to this Complaint took place in this state.

67.     Hyundai Motor America is wholly owned by Hyundai Motor Company.

68.     Hyundai Motor America has been registered to do business in the State of Georgia since 1985. Hyundai Motor America's registered agent for service is CSC of Cobb County, Inc. at 192 Anderson Street SE, Suite 125, Marietta, GA, 30060.

### GENERAL FACTUAL ALLEGATIONS

### I.    Definitions.

69.     Plaintiffs bring this action on behalf of themselves and all persons similarly situated who purchased or leased Class Vehicles manufactured, distributed, or sold by the Vehicle Manufacturer Defendants that contain airbags containing defective inflators manufactured by

Defendant ARC. Plaintiffs seek redress individually and on behalf of those similarly situated for economic losses stemming from the Defendants' manufacture and use of Defective Airbags in the Class Vehicles, including but not limited to diminished value, loss of use, and out-of-pocket costs. Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages and statutory penalties, and injunctive relief/equitable relief.

70.    Airbags with the Inflator Defect are sometimes referred to as "Defective Airbags."

71.     "Class Vehicles" refers to all vehicles purchased or leased in the United States that have hybrid inflators manufactured by Defendant ARC.

## II.    ARC is a Major Manufacturer of Airbag Inflators.

72.    Defendant ARC is a global manufacturer that produces a full complement of inflators for automotive airbag applications (driver, side, head, knee, seat, seatbelt, and curtain).

73.    ARC advertises its core values as "safety, people, commitment, integrity, and communication."

74.    ARC claims to maintain "safety" and "integrity" as core values,[3] yet ARC has failed to live up to these assurances by *inter alia*:

a.    manufacturing, distributing, and selling airbags that can cause serious bodily injury or death;

b.    intentionally concealing the foregoing from Plaintiffs, Class members, and federal regulators; and

---

[3] About Us, ARC – PIONEERING SAFETY, SINCE 1948, http://www.arcautomotive.com/about.html, last visited July 7, 2022.

c.      making incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs, Class members, and federal regulators that contradicted these representations.

## III.   ARC's Defectively Designed and Manufactured Inflators

### A.     ARC's Poor and Dangerous Design And Production Process

75.     The Defective Inflators are a hybrid technology that uses both a propellant explosive and stored compressed gasses to rapidly inflate the air bag. These inflators are also toroidal in shape.

76.     Defendant ARC has offered its Vehicle Manufacturer Defendants a variety of drivers and passenger hybrid toroidal inflators since 2001.

77.     All ARC hybrid toroidal inflators share the same "donut" housing shape.

78.     The ARC designations of their driver's hybrid toroidal inflators are CADH/DH-7 (single stage) and DCADH (dual stage). The passenger designations are PH7-90, PH7-120 (single stage) and PH7-120, DPH7 (dual stage).



**Left: Top down view of an ARC hybrid toroidal inflator.  Right: Cross sectional view of an ARC hybrid toroidal inflator.**

79.     The ARC hybrid design inflator relies on two distinct sources of energy. The inflator fills the air bag cushion by releasing an inert gas stored in the inflator at high pressure. This gas mixture is augmented by an ammonium nitrate-based propellant. The pressurized gas

mixture and propellant are contained entirely within a hermetically sealed steel housing and is therefore isolated from external atmospheric conditions. The ARC hybrid inflators are manufactured in both single stage and dual stage designs.

80.    All ARC hybrid inflators utilize friction welding to join the three inflator housing components together. The housing components of the ARC hybrid inflators consist of an upper pressure vessel, a lower pressure vessel and a center support.



**Above: An exploded view of sections of the ARC hybrid inflator sections.**

81.    Friction welding is welding technique in which heat is generated by mechanical friction between a moving component and a stationary one, while at the same time applying a lateral force called an 'upset' to the parts, in order to plastically displace and fuse the material.



**Above: Examples of friction welding techniques.**

82.     The ARC hybrid inflators utilize three separate friction welds. The first friction weld (1) is between the lower pressure vessel and the center support. The second friction weld (2) is between the center support and the upper pressure vessel. The third and final friction weld (3) joins the lower and upper pressure vessels together. Friction welds 2 and 3 are performed during the same operation.



**Left: Friction weld (1). Right: Friction welds (2) and (3).**

19

83.    Flash is created during the friction welding process as the components are being welded together. Controlled and consistent flash creation is a normal and expected by-product of the friction welding process.

84.    When friction welding tube shaped components, such as the center support, flash is generated on both the inner and outer diameters of the center support where the center support interfaces with the pressure vessel.



**Above: 3D Model showing center tube to lower pressure vessel flash**



**Above: Actual part showing center tube to lower pressure vessel flash**



**Above: Flashing on the inner diameter of the support tube of an exemplar ARC hybrid inflator.**

85.    If certain parameters, such as part to part alignment, rotational speed, or the force applied to the parts being welded are out of specification during the friction welding process, excess flash will collect at the mating points of the parts being welded.

86.    This weld flash is a violation of 49 C.F.R. § 178.65 (c)(2)(vi) which requires that welded seams must be properly aligned and welded by a method that provides clean, uniform joints with adequate penetration.

87.    The design defect and subsequent manufacturing defect involves the friction weld between the upper pressure vessel and the center support which is adjacent to the gas exit port where excess, asymmetrical weld flash is being created at the support tube inner diameter to upper pressure vessel interface.



**Above: Views of excess, asymmetrical weld flash at the support tube inner diameter to upper pressure vessel interface in field collected ARC hybrid inflators collected.**

88.     During deployment the excess weld flash can dislodge from the friction weld and travel to the adjacent gas exit orifice.

89.     If the dislodged weld flash is not large enough to block the gas exit orifice, the dislodged weld flash will exit the inflator.

90.     If the dislodged weld flash is large enough to block the gas exit orifice, the dislodged weld flash will result in an increase of pressure in the inflator housing.

91.     As the internal pressure of the inflator increases due to the gas exit port restriction, the toroidal housing expands, deforms, and changes shape from the toroid shape to more of a ball shape until it reaches the point of rupture.

92.     During a driver side rupture of ARC hybrid inflator, the inflator housing expands due to the excessive internal pressure. Simultaneously, the center support restricts the expansion and is stretched as the inflator housing expands. The inflator housing stretches at its weakest points, which are the stage 1 and stage 2 gas ports located at the middle of the center support, and fractures under tension at these locations. After the center support fractures, the gas exit port end of the center support breaks free of the upper pressure vessel and is propelled towards the driver.

93.     When the inflator housing ruptures, internal components of the inflator are propelled into the passenger compartment which can injure or kill the occupants.

94.     In addition to propelling internal inflator components towards the driver, the entire module assembly may also break free of the steering wheel and strike the driver which can cause injury or death.

95.     The mounting position, orientation, and location of passenger side ARC hybrid inflators, which is in the passenger's side dashboard, reduces (when compared to the driver's side inflator) but does not eliminate the chance for injury or death.

96.     The passenger side ARC hybrid inflators are mounted in an angled, vertical position with the gas exit port pointing towards the windshield. This orientation, and the inflator's location in the dashboard, reduces the probability of the type of injuries associated with the driver's inflators.

97.     As of May 17, 2022, all of the North American field events, except one, have been events involving the rupture of a driver's side inflator, including the two events resulting in death.

**B.     ARC's Deficient Manufacturing and Quality Control**

98.     ARC ran manufacturing plants rife with glaring and persistent manufacturing and quality control problems.

99.     These manufacturing and quality control problems exacerbated the excess friction weld flash issues and collectively cause the Inflator Defect.

100.    In an October 2016 letter published by NHTSA, the agency criticized ARC for failing to uphold quality control in its facilities. The letter stated in relevant part:

> Additionally, a number of incidents involving ARC's product have been brought to NHTSA's attention by vehicle manufacturers and other suppliers. These incidents range from testing failures to recalls, and raise serious questions regarding the quality and integrity of ARC's air bag inflators. While vehicle manufacturers and other suppliers have voluntarily notified NHTSA of these and other incidents without the need for a formal request, ARC has failed to take any steps to notify the Agency of these incidents, or their potential relationship to the incidents under investigation. After the Agency learned of one of these incidents earlier this year, the Agency contacted ARC and indicated that the company needed to provide this type of information to NHTSA proactively. Instead of noting the serious nature of these incidents and committing to work with NHTSA to determine the appropriate range of issues at hand, ARC's counsel stated that they had no obligation to provide such information and chastised Agency staff for indicating otherwise.[4]

---

[4] Nat'l Highway Traffic Safety Admin., EA16-003, Ltr to ARC Automotive, Inc., Aug. 9, 2016.

101.    Further, on information and belief, ARC failed to implement meaningful manufacturing process changes and effective quality control systems until 2018.

102.    On information and belief, in 2018, ARC implemented manufacturing process changes including a system to visually inspect 100% of the upper vessel to support tube friction welds prior to sale.

103.    Implementing this quality control measure sooner was a preventable means to stop inflators containing the Inflator Defect from reaching consumers.

104.    Nor is this the first time that ARC has already been accused of improper/defective welding. During the infamous Takata recalls,[5] the bankrupt successor entity to Takata Corporation, TK Holdings, Inc. brought suit against ARC alleging that ARC provided Takata with defective inflators caused TK Holdings' customer (General Motors) to issue a recall on its vehicles manufactured during the period the defective inflators were supplied by ARC. TK Holdings, Inc. alleged *inter alia* damages arising from breach of contract.

105.    As alleged by TK Holdings, Inc.:

> ARC's inflators failed due to improper/defective welding. Indeed, upon information and belief, ARC failed to properly train its weld operators, failed to provide standard work instructions for its weld operators, failed to properly post visual inspection standards at weld work stations, and welding equipment was not properly cleaned and maintained, among other failures.

106.    As aptly stated by TK Holdings, Inc., the successor to the infamous Takata Corporation, "The inflators provided by ARC were not reasonably fit for their intended,

---

[5] The Takata recalls involved vehicles made by 19 different automakers have been recalled to replace frontal airbags on the driver's side or passenger's side, or both in what NHTSA has called "the largest and most complex safety recall in U.S. history." The airbags, made by major parts supplier Takata, were installed in cars mostly from model years 2002 through 2015. Some of those airbags could deploy explosively, injuring or even killing car occupants.

anticipated, or reasonably foreseeable use." Accordingly, the defective inflators suffered from the additional issue of poor process control.

## IV.    ARC Inflator Failures and Defendants' Inadequate Reaction

### A.    Early Injuries and Deaths Spur Investigation

107.    There have been at least seven known field ruptures of ARC's Defective Inflators in vehicles, including five driver inflators and one passenger inflator. Two of these ruptures resulted in a driver fatality. The non-fatal injuries suffered were often life threatening and life changing in their severity. Additionally, multiple passenger inflators have ruptured during Lot Acceptance Testing. Five of the ruptures resulted in significantly limited lot-based recalls of other vehicles that contained inflators only from the suspect lot.

108.    In January 2009, in Ashtabula County Ohio, an ARC DCADH ruptured in a 2002 Chrysler Town and Country minivan severely injuring Lois Dutton. According to Ms. Dutton "It broke my jaw in three places. Collapsed a lung," she explained. It even sent shrapnel through her chest and out of her back. Ms. Dutton spent three months in a medically-induced coma after the incident, and faces hundreds of thousands of dollars in medical bills.

109.    The Dutton ARC rupture was attributed to a "single isolated event" and no actions were taken.

110.    This occurrence and write off as a "single isolated event" is very similar to what occurred in the Takata recall with what is known as Event Zero. Event Zero was the first field rupture of a Takata PSAN PSDI inflator. Instead of performing a thorough investigation Takata and Honda wrote it off as an "anomaly" and only took any action when additional field ruptures took place 3 years later.

111.    In June of 2015, NHTSA became aware of an ARC driver's side inflator rupture that occurred on April 8, 2014, in New Mexico in a 2004 Kia Optima. The ARC inflator in this incident was a single stage driver's inflator designated "CADH" made at ARC's Knoxville, Tennessee, facility which ruptured during a frontal impact crash. The driver suffered serious injuries.

112.    The driver brought suit against Kia Corporation and Kia America, Inc., under their previous names, and the lawsuit was settled quickly. Kia did not issue a recall. In its investigation, NHTSA indicated that this inflator was placed in a Delphi Automotive Systems Corp. airbag module assembly. Delphi was acquired by Autoliv, Inc., in 2009.

## B.    Ongoing NHTSA Investigation

113.    As a result of the ruptures of the Defective Inflators in the 2002 Town & County minivan and the 2004 Kia Optima, NHTSA opened Preliminary Evaluation 15-027 (PE15-027) in July 2015 stating:

114.    Both driver air bag inflators were manufactured by ARC, a tier-two supplier of automotive air bag systems, at their manufacturing facility in Knoxville Tennessee. All ARC driver air bag inflators are a hybrid design that fills the air bag by releasing an inert gas mixture stored in the inflator at high pressure.

115.    As detailed in this Complaint, over the course of seven years ARC and the Vehicle Manufacturer Defendants have been involved in a continuing investigation overseen by NHTSA that commenced on July 27, 2015.

116.    As deaths, injuries, and Lot Acceptance Testing (LAT) ruptures have occurred, Vehicle Manufacturer Defendants issued a series of partial, confusing, and ultimately ineffective recalls to address the Defective Airbags.

117.     These recalls represent lot-based recalls and cover only 5,070 of the over 30 million affected vehicles.

118.     For reference, the following table identifies the currently recalled vehicles by manufacturer that on information and belief contain the Inflator Defect:

| Recall | Date | Manufacturer | Affected Vehicles | Population |
|---|---|---|---|---|
| 17V-189 | 3/21/2017 | BMW | 2017-2017 BMW X5 sDrive35i, X5 xDrive35i, X5 xDrive50i<br>2017-2017 BMW X5 xDrive35d<br>2017-2017 BMW X5 xDrive40e | 36 |
| 17V-529 | 8/31/2017 | Ford | 2017-2017 Ford F150<br>2017-2017 Ford Mustang | 650 |
| 19V-019 | 1/31/2019 | General Motors | 2010-2011 Chevrolet Malibu | 1,145 |
| 21V-782 | 10/21/2021 | General Motors | 2008-2017 Buick Enclave<br>2013-2017 Chevrolet Traverse | 552 |
| 22V-246 | 4/14/2022 | General Motors | 2015-2015 Buick Enclave<br>2015-2015 Chevrolet Traverse | 2,687 |
| | | | Total Recall Population: | 5,070 |

119.     In July 2016, NHTSA was informed by Transport Canada of a fatal incident involving a driver's side air bag rupture in a 2009 Hyundai Elantra. The inflator was identified as an ARC CADH single stage inflator manufactured at ARC's facility in China. The nature of the fatal injury suffered by the driver of the 2009 Hyundai Elantra was detailed as a " penetrating neck injury secondary to motor vehicle accident."

120.     On August 4, 2016, as a result of the fatal ARC inflator rupture detailed above, NHTSA upgraded its Preliminary Evaluation 15-027 of ARC Automotive Inc. airbag inflators to an Engineering Analysis 16-003 (EA16-003) stating in part:

> It was determined that incident inflator was manufactured by ARC and had ruptured in substantially the same manner as the two previous incidents known to ODI. The driver air bag module in the subject 2009 Hyundai Elantra utilized a single-stage inflator manufactured at ARC's facility in China. ARC confirmed that the inflator in the 2009 Hyundai Elantra was substantially the same design as the single-stage inflator in the 2004 Kia Optima and was assembled using substantially the same manufacturing process.

121.     Based on an October 4, 2016, letter from Michael Brown, NHTSA Acting Director of Office Defect Investigation to Michael Goodin, Chief Executive Officer ARC Automotive, it

was noted that ARC had failed to notify NHTSA of multiple incidents involving ARC products. As stated:

> Additionally, a number of incidents involving ARC's product have been brought to NHTSA's attention by vehicle manufacturers and other suppliers. These incidents range from testing failures to recalls and raise serious questions regarding the quality and integrity of ARC's air bag inflators. While vehicle manufacturers and other suppliers have voluntarily notified NHTSA of these and other incidents without the need for a formal request, ARC has failed to take any steps to notify the Agency of these incidents, or their potential relationship to the incidents under investigation. After the Agency learned of one of these incidents earlier this year, the Agency contacted ARC and indicated that the company needed to provide this type of information to NHTSA proactively. Instead of noting the serious nature of these incidents and committing to work with NHTSA to determine the appropriate range of issues at hand, ARC's counsel stated that they had no obligation to provide such information and chastised Agency staff for indicating otherwise.

122.    The October 4, 2016, NHTSA letter states "These incidents range from testing failures to recalls and raise serious questions regarding the quality and integrity of ARC's air bag inflators."

123.    According to the October 4, 2016 NHTSA letter, ruptures involving ARC hybrid inflators during testing led to recalls, but there are no supporting documents provided within the publicly available EA-16003 file.

124.    According to the opening resume of EA-16003, the focus of NHTSA's investigation will be to identify the population of ARC inflators in the United States:

> ODI's investigation will focus on determining the entire US population of ARC manufactured driver air bag inflators, single- and dual-stage, identification of affected vehicle manufacturers, and whether any single-stage driver air bag inflators manufactured at ARC's facility in China were used in vehicles produced for sale or lease in the United States. Additionally, ODI will conduct a program to recover the subject ARC inflators from vehicles in the field for further testing and evaluation in support of root cause analysis.

125.    The statement "Additionally, ODI will conduct a program to recover the subject ARC inflators from vehicles in the field for further testing and evaluation in support of root cause analysis" would indicate that NHTSA oversaw and participated in a root cause analysis of the ARC

28

hybrid inflator defect similar to that conducted in the Takata recall yet there are no publicly available documents available to confirm this.

126.    In the October 4, 2016 letter, NHTSA accused ARC of missing multiple deadlines to provide data and test results showing inflator failures, failing to report a recall done by Toyota due to an ARC inflator defect, and failing to comply with directives from the agency.

127.    ARC has questioned whether it needs to give NHTSA the requested information, has failed to provide documents in a readable format, and has "appeared nonchalant" in developing a plan to test the inflators, the letter said. "Instead of noting the serious nature of these incidents earlier this year and committing to work with NHTSA to determine the appropriate range of issues at hand, ARC's counsel stated that they had no obligation to provide such information and chastised agency staff for indicating otherwise," said the letter from Michael Brown, acting director of NHTSA's Office of Defects Investigation.

128.    NHTSA threatened to hold a public hearing and fine the company up to $21,000 per day to a maximum of $105 million.

129.    NHTSA also stated that ARC failed to file a legally required report concerning the fatality in Canada, and that NHTSA found out about the death from reports by Hyundai and Canadian safety regulators.

130.    According to NHTSA, the Elantra in the Newfoundland crash had an ARC inflator that was made in China, but it's unknown whether any of the same inflators were used in other vehicles within the United States. ARC has confirmed that the Canadian Elantra inflator "was substantially the same design" as the one used in at least one other U.S. model, the 2004 Optima, the agency said.

C.    **Mounting Deaths And Belated Recalls**

131.    On March 21, 2017, BMW issued Recall 17V-189 for 36 vehicles equipped with ARC DPH-7 passenger front inflators. The DPH-7 uses the same friction welding process as both the CADH and DCADH. According to the Part 573 Safety Recall Report:

> Depending on the circumstances, impaired gas flow could create excessive internal pressure, which could result in the body of the inflator rupturing upon deployment. Metal fragments could pass through the air bag cushion material, which may result in injury or death to vehicle occupants.

132.    On August 31, 2017, Ford issued Recall 17V-529 for six hundred fifty F-150 and Mustang vehicles equipped with ARC's PH7-120 dual stage passenger inflator which uses the same friction welding process as the DPH-7, CADH and DCADH. According to the Part 573 Safety Recall Report:

> July 31, 2017, The Tier 1 airbag module supplier notified Ford of an abnormal deployment of a passenger Airbag (PAB) inflator during a Lot Acceptance Test (LAT) conducted at the supplier's engineering facility. The inflator ruptured during full output at +65 Celsius.

133.    During August of 2017, the concerns outlined in the Part 573 Safety Recall Report were reviewed by Ford's Critical Concern Review Group (CCRG). Preliminary analysis indicates that weld flash from the inflator canister welding process at the Tier 2 inflator supplier may obstruct the gas exhaust port. LAT testing frequency was increased and a Design of Experiments was initiated to further evaluate potential factors.

134.    According to the documents included in the EA-16003 document request, ARC implemented equipment and process improvements on all toroidal inflator assembly lines on January 31, 2018.

135.    On April 11th, 2018, Transport Canada issued Recall #2018-173 for 2,022 model year 2009 Hyundai Elantras. This recall was performed to collect parts for Transport Canada defect investigation 3280-38-10 in an effort to aid in the analysis by Hyundai and Transport Canada. The

recovery program ended on February 5, 2020 with a note stating: "No safety defect has been identified with these vehicles and this action is not being conducted under the requirements of the Motor Vehicle Safety Act."

136.    On January 31, 2019, General Motors issued recall 19V-019 for 1,145 model year 2010-2011 Chevrolet Malibu vehicles based on a field report of an inflator rupture. According to the Part 573 Safety Recall Report:

> On November 30, 2017, an attorney contacted GM and claimed that, on September 22, 2017, the front-driver airbag inflator in a 2011 Chevrolet Malibu ruptured during a crash-related airbag deployment and injured his client.

> On December 6, 2017, GM reported the allegation to NHTSA under Standing General Orders 2015-01and 2015-02. To date, GM has filed 13 supplemental General Order reports updating NHTSA on the status of its investigation of the incident.

> From November 30, 2017, through December 13, 2018, GM made multiple attempts, through the claimant's attorney and other means, to locate and inspect the vehicle to confirm whether a rupture occurred. GM was not permitted to inspect the vehicle until December 13, 2018, on which date a GM engineer inspected the vehicle and components. Based on that inspection, GM determined that the front-driver airbag inflator in the subject vehicle likely over pressurized and ruptured during deployment.

> On December 19, 2018, GM presented the inspection photos and its preliminary analysis to NHTSA. On December 20, 2018, GM's Safety Field Action Decision Authority (SFADA) decided to conduct a safety recall on the ARC inflators built in the suspect manufacturing lot. GM is not aware of other rupture allegations involving this ARC inflator in GM vehicles.

137.    On Wednesday, October 13, 2021, the National Highway Traffic Safety Administration posted recall documents filed by General Motors that revealed a second death, the driver of a 2015 Chevrolet Traverse SUV with an ARC inflator that ruptured and expelled shrapnel. No details were given about where and when the death occurred.[6]

---

[6] *Second driver killed by airbag inflator from Tennessee's ARC*, AUTOBLOG, Oct. 14, 2021, https://www.autoblog.com/2021/10/14/arc-airbag-inflator-death-gm-nhtsa-investigation/ (last visited July 20, 2022).

138.    On August 15, 2021, a driver in Calumet, Michigan, was killed due to a rupture of the ARC driver hybrid inflator in her 2015 Chevrolet Traverse. The victim, who was driving with two of her children as passengers, collided with an oncoming vehicle that crossed into her lane, and her airbag deployed.

139.    According to the police investigation, "It appeared that the driver's side airbag malfunctioned causing it to detach from the steering column and sent metal fragments into the driver's compartment of the vehicle. The igniter for the front driver's side airbag was found on the passenger side dashboard. There was also metal shrapnel on the driver's side dash, in the instrument cluster and markings on the driver's side roof which appeared to come from the driver's side airbag."

140.    The police investigation report noted that the autopsy of the victim found parts of the metal airbag inflator lodged in her neck. The other passengers in the victim's vehicle, including an unbelted right front passenger and occupants in the second and third row seats, survived the crash.

141.    GM sent a contract field investigator to examine the vehicle on September 8, 2021. On September 14, 2021, another GM field investigator accompanied by the police investigator performed x-rays on the metal shards that were removed during the autopsy. Further inspection of the vehicle and airbag pieces were examined by counsel representing the victim's family, plaintiff's expert, GM, ARC, and Toyoda Gosei (the Tier 1 supplier to GM) on October 27, 2021. The investigation report includes a photograph of the ruptured inflator, which is unrecognizable as an inflator due to the extent of the damage, as depicted below:

142.    On October 7, 2021, General Motors issued recall 21V-782 for 550 model year 2008-2017 Buick Enclave and 2013-2017 Chevrolet Traverse vehicles based on the August 15,

2021 field report of an inflator rupture. On October 21, 2021, the number of affected vehicles was updated to 552 on an Amended Part 573 Report. The 2015 Chevrolet Traverse at the root of Recall 21V-782 is equipped with an ARC dual stage DCADH on the driver's side. According to the Part 573 Safety Recall Report:

143.    On October 20, 2021, just south of Lexington, Kentucky there was another rupture of an ARC hybrid driver inflator involving a second 2015 Chevrolet Traverse. The date of the accident is based on General Motor's EWR report submitted in May of 2022.

144.    Based on this incident defendant General Motors issued Recall 22V-246 on April 14, 2022, for 2,687 vehicles including:

    A.  2015 Buick Enclaves (542)

    B.  2015 Chevrolet Traverse (1183)

    C.  GMC Arcadias (962)

145.    The chronology listed in the Recall 22V-246 Part 573 report states:

On November 9, 2021, GM received a claim letter from an attorney representing the owner of a 2015 model year Chevrolet Traverse that was involved in a crash. On February 18, 2022, the claimant alleged that the front-driver airbag inflator in the vehicle ruptured during the crash.

GM was provided an opportunity to inspect the vehicle on March 23, 2022. GM determined, at that inspection, that the front driver airbag inflator in the subject vehicle ruptured during the crash deployment.

On April 7, 2022, GM's Safety and Field Action Decision Authority decided to conduct a safety recall on all front driver airbag modules containing an inflator from the same manufacturing lot as the inflator under investigation. GM is continuing to investigate this incident. GM's investigation has not identified another rupture allegation involving the vehicles in this recall population.

146.    The approach taken by the Defendants in addressing this ongoing manufacturing defect has been to wait until an incident occurs and then recall the vehicles effected by the specific

lot of inflators that were produced at the same time as the failed unit. A reactive rather than proactive response.

147.    As of May 13, 2022, there has been limited public disclosure of the data requested by NHTSA from the Vehicle Manufacturer Defendants or ARC.

148.    The original requests for information surrounding the ARC inflator ruptures are dated August 4, 2016.

149.    The most recent documents provided to the public on the NHTSA website are dated from May 27, 2021 to June 28, 2021 and only involve discussion of extending the deadline for the turning over the requested documents.

150.    According a memo dated April 13, 2021 NHTSA states:

The manufacturer's response to the Office of Defect Investigation (ODI)'s information request for this investigation is being reviewed and redacted to remove all personally identifiable information (PII) as required by federal law. These responses are usually complex, contain a large volume of documents, and require additional time for review and redaction. The public version of the response will be posted to this investigation file when available. While ODI's investigation is ongoing, we recommend that you periodically review this investigation file for additional documents and updates.

151.    Over 1 year has passed since NHTSA claimed the public version of the documents would be made available and not one document has been made available as of May 13, 2022.

152.    Recall 22V-246 represents the second field rupture of an ARC hybrid inflator in a 2015 Chevrolet Traverse equipped with a driver's ARC DCADH inflator and exemplifies that the "lot based" recall strategy being applied to the ARC hybrid inflator ruptures does not work.

153.    Upon information and belief, the Defendants manufacturing controls and records do not allow them to identify defective lots prior to a field rupture taking place.

154.    Similarly, no field-based inspection can be performed to identify inflators with the friction weld defect.

155.    There are only two approaches available, 1.) Recall all ARC hybrid toroidal inflators OR 2.) wait until another field rupture takes place and recall the inflators of the same lot.

156.    The Defendants "Wait and See" approach places drivers and passengers of vehicles that utilize an ARC hybrid toroidal inflator at risk. The two drivers of the 2015 Chevrolet Traverses were the latest guinea pigs the Defendants used to identify 2 defective lots of ARC inflators and they will not be the last unless all ARC hybrid toroidal inflators are recalled.

157.    In fact, in the October 4, 2016, letter from NHTSA to ARC's Chief Executive Officer ARC's position on the serious of the matter was called out quite clearly by Michael Brown, Acting Director Offices of Defect Investigation:

158.    ARC's response to the Agency's investigation to date does not demonstrate the behavior that NHTSA expects of manufacturers, much less manufacturers of vital safety components utilized in vehicles across the globe. To the contrary, ARC's behavior has demonstrated a lack of cognizance regarding the seriousness of this investigation and the underlying issues.

159.    The following table identifies, to the best of Plaintiffs' understanding, and without the benefit of discovery, the vehicles equipped with an ARC hybrid inflator, the model years involved, the installed position of ARC hybrid inflator (driver side, passenger side, or both):

| Defendant | Make | Model | MY |
|---|---|---|---|
| FCA US | Chrysler | 200 | 2015-2017 |
| FCA US | Chrysler | 300 LX | 2016-2017 |
| FCA US | Chrysler | PT Cruiser | 2001-2002 |
| FCA US | Chrysler | Town & Country | 2001-2007 |
| FCA US | Dodge | Caravan | 2001-2007 |
| FCA US | Dodge | Challenger | 2015-2017 |
| FCA US | Dodge | Charger/Magnum LX | 2016-2017 |
| FCA US | Dodge | Grand Caravan | 2001-2007 |
| FCA US | Jeep | Cherokee | 2016-2017 |
| Ford | Ford | Crown Victoria | 2004-2011 |

| Ford | Lincoln | Town Car | 2004-2011 |
|---|---|---|---|
| Ford | Mercury | Grand Marquis | 2004-2011 |
| Ford | Ford | F150 | 2015-2017 |
| Ford | Ford | Mustang | 2015-2017 |
| General Motors | Buick | Envision | 2016-2017 |
| General Motors | Buick | LaSabre | 2002-2005 |
| General Motors | Buick | Terraza | 2005-2008 |
| General Motors | Buick | Enclave | 2008-2017 |
| General Motors | Buick | Encore | 2013-2017 |
| General Motors | Buick | LaCrosse | 2005-2009 |
| General Motors | Buick | Lucerne | 2006-2011 |
| General Motors | Buick | Rainier | 2004-2007 |
| General Motors | Buick | Rendezvous | 2002-2007 |
| General Motors | Cadillac | ATS | 2013 - 2017 |
| General Motors | Cadillac | CTS | 2003-2007 |
| General Motors | Cadillac | CTS | 2008-2014 |
| General Motors | Cadillac | CTS | 2014 - 2017 |
| General Motors | Cadillac | Deville | 2002-2005 |
| General Motors | Cadillac | DTS | 2006-2011 |
| General Motors | Cadillac | ELR | 2013-2016 |
| General Motors | Cadillac | Escalade 1500 | 2002-2006 |
| General Motors | Cadillac | Escalade 1500 | 2007-2014 |
| General Motors | Cadillac | Escalade 1500 | 2015-2017 |
| General Motors | Cadillac | Escalade ESV | 2002-2006 |
| General Motors | Cadillac | Escalade ESV | 2007-2014 |
| General Motors | Cadillac | Escalade ESV | 2015-2017 |
| General Motors | Cadillac | Escalade EXT | 2002-2006 |
| General Motors | Cadillac | Escalade EXT | 2007-2013 |
| General Motors | Cadillac | SRX | 2004-2009 |
| General Motors | Cadillac | SRX | 2010-2016 |
| General Motors | Cadillac | STS | 2005-2007 |
| General Motors | Cadillac | XLR | 2004-2009 |
| General Motors | Cadillac | XT5 | 2017 |
| General Motors | Chevrolet | Avalanche 1500 | 2002-2006 |
| General Motors | Chevrolet | Avalanche 1500 | 2007-2013 |
| General Motors | Chevrolet | Avalanche 2500 | 2002-2006 |
| General Motors | Chevrolet | Camero | 2010-2015 |
| General Motors | Chevrolet | Camero | 2016-2017 |
| General Motors | Chevrolet | Captiva | 2011-2017 |
| General Motors | Chevrolet | Cavalier | 2000-2005 |
| General Motors | Chevrolet | Colorado | 2015-2017 |
| General Motors | Chevrolet | Corvette | 2005-2013 |

| General Motors | Chevrolet | Cruze | 2016-2017 |
|---|---|---|---|
| General Motors | Chevrolet | Encore | 2014-2017 |
| General Motors | Chevrolet | Equinox | 2005-2009 |
| General Motors | Chevrolet | Equinox | 2010-2017 |
| General Motors | Chevrolet | Express 1500 | 2003-2017 |
| General Motors | Chevrolet | Express 2500 | 2003-2017 |
| General Motors | Chevrolet | Express 3500 | 2003-2017 |
| General Motors | Chevrolet | HHR | 2006-2010 |
| General Motors | Chevrolet | Impala | 2006-2014 |
| General Motors | Chevrolet | Impala | 2015-2017 |
| General Motors | Chevrolet | Malibu | 2004-2007 |
| General Motors | Chevrolet | Malibu | 2008-2012 |
| General Motors | Chevrolet | Malibu Maxx | 2004-2007 |
| General Motors | Chevrolet | Monte Carlo | 2006-2017 |
| General Motors | Chevrolet | Silverado 1500 | 2000-2007 |
| General Motors | Chevrolet | Silverado 1500 | 2007-2014 |
| General Motors | Chevrolet | Silverado 2500 | 2000-2007 |
| General Motors | Chevrolet | Silverado 2500 | 2007-2014 |
| General Motors | Chevrolet | Silverado 3500 | 2000-2007 |
| General Motors | Chevrolet | Silverado 3500 | 2007-2014 |
| General Motors | Chevrolet | SSR | 2003-2005 |
| General Motors | Chevrolet | Suburban 1500 | 2000-2006 |
| General Motors | Chevrolet | Suburban 1500 | 2007-2014 |
| General Motors | Chevrolet | Suburban 2500 | 2007-2013 |
| General Motors | Chevrolet | Tahoe 1500 | 2000-2006 |
| General Motors | Chevrolet | Tahoe 1500 | 2007-2014 |
| General Motors | Chevrolet | Trailblazer | 2003-2009 |
| General Motors | Chevrolet | Trailblazer EXT | 2003-2006 |
| General Motors | Chevrolet | Traverse | 2009-2017 |
| General Motors | Chevrolet | Trax | 2014-2017 |
| General Motors | Chevrolet | Uplander | 2005-2008 |
| General Motors | Chevrolet | Venture | 2000-2005 |
| General Motors | Chevrolet | Volt | 2011-2015 |
| General Motors | GMC | Canyon | 2015-2017 |
| General Motors | GMC | Savana 1500 | 2003-2017 |
| General Motors | GMC | Savana 2500 | 2003-2017 |
| General Motors | GMC | Savana 3500 | 2003-2017 |
| General Motors | GMC | Sierra 1500 | 2000-2007 |
| General Motors | GMC | Sierra 1500 | 2007-2014 |
| General Motors | GMC | Sierra 2500 | 2000-2007 |
| General Motors | GMC | Sierra 2500 | 2007-2014 |
| General Motors | GMC | Sierra 3500 | 2000-2007 |

| General Motors | GMC | Sierra 3500 | 2007-2014 |
|---|---|---|---|
| General Motors | GMC | Terrain | 2010-2017 |
| General Motors | GMC | Yukon 1500 | 2000-2006 |
| General Motors | GMC | Yukon 1500 | 2007-2014 |
| General Motors | GMC | Yukon XL 1500 | 2000-2006 |
| General Motors | GMC | Yukon XL 1500 | 2007-2014 |
| General Motors | GMC | Yukon XL 2500 | 2000-2006 |
| General Motors | GMC | Yukon XL 2500 | 2007-2014 |
| General Motors | GMC | Acadia | 2017 |
| General Motors | GMC | Acadia | 2007-2016 |
| General Motors | GMC | Envoy | 2003-2009 |
| General Motors | GMC | Envoy XL | 2003-2006 |
| General Motors | GMC | Envoy XUV | 2004-2005 |
| General Motors | Hummer | H2 | 2003-2009 |
| General Motors | Hummer | H3 | 2006-2010 |
| General Motors | Isuzu | Ascender | 2003-2008 |
| General Motors | Oldsmobile | Silhoutte | 2000-2004 |
| General Motors | Oldsmobile | Bravada | 2002-2004 |
| General Motors | Oldsmobile | Silhoutte | 2005-2008 |
| General Motors | Pontiac | Aztek | 2002-2007 |
| General Motors | Pontiac | Bonniville | 2002-2005 |
| General Motors | Pontiac | Montana | 2000-2004 |
| General Motors | Pontiac | Montana | 2005-2009 |
| General Motors | Pontiac | Sunfire | 2000-2005 |
| General Motors | Pontiac | G6 | 2005-2010 |
| General Motors | Pontiac | Grand Am | 2005-2006 |
| General Motors | Pontiac | Torrent | 2006-2009 |
| General Motors | Saab | Saab 9-3 | 2003-2012 |
| General Motors | Saab | Saab 9-5 | 2010-2012 |
| General Motors | Saturn | Aura | 2007-2010 |
| General Motors | Saturn | Outlook | 2007-2010 |
| General Motors | Saturn | Relay | 2005-2008 |
| General Motors | Saturn | Vue | 2002-2007 |
| Hyundai | Hyundai | Accent | 2012-2017 |
| Hyundai | Hyundai | Azera | 2006-2011 |
| Hyundai | Hyundai | Elantra | 2007-2017 |
| Hyundai | Hyundai | Genesis | 2009-2013 |
| Hyundai | Hyundai | Sonata | 2009-2010 |
| Hyundai | Hyundai | Tiburon | 2003-2005 |
| Hyundai | Hyundai | Tucson | 2005 |
| Hyundai | Hyundai | Tucson | 2007-2010 |
| Hyundai | Hyundai | XG350 | 2002-2005 |

| Kia | Kia | Amanti | 2006-2009 |
|-----|-----|--------|-----------|
| Kia | Kia | Forte | 2014-2016 |
| Kia | Kia | Optima | 2001-2006 |
| Kia | Kia | Rio | 2009-2011 |
| Kia | Kia | Rondo | 2007-2010 |
| Kia | Kia | Sedona | 2006-2014 |
| Kia | Kia | Sportage | 2005-2016 |

160.    Each of the above listed vehicles contains a representation, relied upon by NHTSA, the American public, and the Plaintiffs, in which the respective Vehicle Manufacturer asserts that the vehicle conforms to all applicable Federal motor vehicle safety and theft prevention standards in effect on the date of manufacture. Without this representation from the Vehicle Manufacturer, the Class Vehicles would not have been sold to the Class Members including the named Plaintiffs.

## V.    Defendants' Inadequate Recalls and Failure to Assist Impacted Consumers

161.    The Class Vehicles are not safe to drive. Due to Defendants' failures, Plaintiffs and Class Members are left with poor options: be without the use of a vehicle; purchase, lease, or rent a new vehicle until Defendants first issue and then complete the recall; or use a vehicle with a dangerous or disabled airbag over an extended period of time. These are all, obviously, entirely unacceptable alternatives.

162.    Consequently, because of the inherently dangerous nature of the defect at issue in the class vehicles, Defendants should be compelled to either: (1) provide replacement vehicles; and/or (2) purchase the class vehicles at a fair value calculated for a comparable vehicle with a safe functioning airbag.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment

163.    Upon information and belief, Defendant ARC and the Vehicle Manufacturer Defendants have known of the defects in its airbags since at least 2015. Defendants knew well

before many of the Plaintiffs and Class Members purchased the Class Vehicles, and have concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the Airbag Defect.

164.    Any applicable statute of limitation has therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### Estoppel

165.    Defendants were and are under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles. They actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiffs and Class Members reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

### Discovery Rule

166.    The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their vehicles had the Defective Airbags containing the Inflator Defect.

167.    Plaintiffs and Class Members, however, had no realistic ability to discern that the vehicles were defective until – at the earliest – after either the Defective Airbag exploded or their vehicles were recalled. And even then, Plaintiffs and Class Members had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the defect.

### CLASS ACTION ALLEGATIONS

168.    The Classes' claims all derive directly from a single course of conduct by ARC and the Vehicle Manufacturer Defendants. This case is about the responsibility of ARC and the Vehicle

Manufacturer Defendants, at law and in equity, for their knowledge, their conduct, and their products. ARC and the Vehicle Manufacturer Defendants have engaged in uniform and standardized conduct toward the Classes. They did not differentiate, in degree of care or candor, their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

## The Nationwide Class

169.    Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a Nationwide Class defined as follows:

**All persons who entered into a lease or purchased one or more Class Vehicles in the United States.**

## The State Class

170.    Plaintiffs allege statewide class action claims on behalf of the class in Georgia. This State Class is initially defined as follows:

**All persons in the State of Georgia who entered into a lease or purchased one or more of the Class Vehicles.**

171.    The Nationwide Class, Statewide Class, and their members are sometimes referred to herein as the "Class" or "Classes."

172.    To the extent warranted, the list of Class Vehicles for the purpose of the Nationwide Class and Statewide Class definitions will be supplemented to include other vehicles that have ARC Inflators that may be defective.

173.    Excluded from each Class are ARC and the Vehicle Manufacturer Defendants, their employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of ARC and the Vehicle Manufacturer Defendants; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### Numerosity and Ascertainability

174.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). There are millions of Class Vehicles nationwide, and thousands of Class Vehicles containing the Inflator Defect in Georgia. Individual joinder of all Class members is impracticable.

175.    Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by ARC and the Vehicle Manufacturer Defendants or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

### Predominance of Common Issues

176.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class members. These include, without limitation, the following:

a.      Whether the Class Vehicles suffer from the Inflator Defect;

b.      Whether the Class Vehicles have suffered a diminution of value as a result of those Vehicles' incorporation of the Defective Airbag Modules;

c.      Whether Defendants knew or should have known about the inflator defects, and, if so, how long Defendants have known of the Defect;

d.      Whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Class Vehicle;

e.      Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class Members;

f.      Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

g.      Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing the Class Vehicles;

h.      Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

i.      Whether Defendants misrepresented that the Class Vehicles were safe;

j.      Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with the Inflator Defect;

k.      Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

43

l.      Whether Defendants' statements, concealments and omissions regarding the Class Vehicles were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

m.      Whether Defendants violated each of the States' consumer protection statutes, and if so, what remedies are available under those statutes;

n.      Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

o.      Whether Plaintiffs and the Classes are entitled to a declaratory judgment stating that the airbag inflators in the Class Vehicles are defective and/or not merchantable;

p.      Whether Defendants' unlawful, unfair, and/or deceptive practices harm Plaintiffs and the Classes;

q.      Whether Defendants have been unjustly enriched by their conduct;

r.      Whether Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

s.      Whether Defendants should be declared responsible for notifying all Class members of the defects and ensuring that all vehicles with the airbag inflator defect are promptly recalled and repaired;

t.      What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy;

u.      How such penalties should be most equitably distributed among Class members;

v.      Whether certain Defendants conspired together to violate RICO; and

w.    Whether certain Defendants associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

### Typicality

177.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by ARC and the Vehicle Manufacturer Defendants. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

### Adequate Representation

178.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

179.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

### Superiority

180.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by the individual Class members on the claims asserted herein would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for ARC and the Vehicle Manufacturer Defendants; and because adjudication with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members, or impair substantially or impede their ability to protect their interests.

181.    Absent a class action, most Class Members would likely find the cost of litigating their individual claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, be exposed to deadly products, and Defendants' misconduct will continue without remedy.

182.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants ARC and the Vehicle Manufacturer Defendants have acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

183.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding ARC and the Vehicle Manufacturer Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

184.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

185.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

186.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

187.    The Classes expressly disclaim any recovery in this action for physical injury resulting from the airbag inflator defects without waiving or dismissing such claims. Plaintiffs are informed and believe that injuries suffered in crashes as a result of the defective airbags implicate the Class Vehicles and are continuing to occur because of Defendants' delays and inaction regarding the commencement and completion of recalls. The increased risk of injury from the Inflator Defect serves as an independent justification for the relief sought by Plaintiffs and the Classes.

## REALLEGATION AND INCORPORATION BY REFERENCE

188.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs and allegations of this Complaint, including the Introduction, all Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Nationwide Class and the Statewide Classes.

## CLAIMS FOR RELIEF

### I.    State-Law Claims against ARC Automotive, Inc.

### COUNT 1

### Fraudulent Concealment

189.    Plaintiffs bring this claim on behalf the Nationwide Class under Georgia law, because, with respect to the facts and issues relevant to this case, there are no true conflicts (case-dispositive differences) among various states' law of fraudulent concealment. In the alternative, if Georgia law does not apply, it is brought under the laws of the states where Plaintiffs and Class Members reside.

190.    ARC concealed and suppressed material facts regarding the Defective Airbags—most importantly, the Inflator Defect and their resulting propensity to cause the inflator to rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants.

191.    ARC took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

192.    On information and belief, ARC still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the Inflator Defect that exists in the Defective Airbags.

193.    ARC had a duty to disclose the defect because it:

a.    Had exclusive and/or far superior knowledge and access to the facts than Plaintiffs and Class Members, and ARC knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.    Intentionally concealed the foregoing from Plaintiffs;

c.    Was required to accurately describe the vehicle's air bag system in an easily understandable format under 49 C.F.R. § 571.208 S4.5.1(f)(1);

d.    Was required to provide any necessary precautions regarding the proper positioning of occupants to ensure maximum safety protection of those occupants within the owner's manual under 49 C.F.R. § 571.208 S4.5.1(f)(1); and

e.    Made incomplete representations about the safety and reliability of the Defective Airbags and, by extension, the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

194.    ARC concealed and suppressed the material facts concerning the statements affixed to the Class Vehicles under 49 C.F.R. § 567.4 (g) (5).

195.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiffs and Class Members trusted Defendants not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

196.     ARC concealed and suppressed these material facts to falsely assure purchasers and consumers that its airbags were capable of performing safely, as represented by ARC and reasonably expected by consumers.

197.     ARC actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and to avoid recalls that would hurt the brand's image and negatively impact ARC's financial bottom line. ARC concealed these facts at the expense of Plaintiffs and the Class.

198.     Plaintiffs and the Class were unaware of these omitted material facts, and would not have acted as they did if they had known of the concealed and/or suppressed facts.

199.     Had they been aware of the Defective Airbags, and ARC's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of ARC's fraudulent concealment.

200.     Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of ARC's concealment of, and failure to timely disclose, the serious defects in millions of Class Vehicles and the serious safety and quality issues caused by ARC's conduct.

201.     The value of all Class members' vehicles has diminished as a result of ARC's fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

202.     Accordingly, ARC is liable to the Class for their damages in an amount to be proven at trial.

203.    ARC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching ARC. ARC's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 2

### Breach of Implied Warranty of Merchantability

204.    Plaintiffs bring this Claim on behalf of the Nationwide Class under Georgia law. In the alternative, if Georgia law does not apply, it is brought under the laws of the states where Plaintiffs and Class Members reside.

205.    ARC is and was at all relevant times merchants with respect to motor vehicle component parts, such as airbag inflators and sellers of motor vehicle component parts, such as airbag inflators.

206.    The Class Vehicles and component parts, such as airbag inflators, are and were at all relevant times goods.

207.    A warranty that the Class Vehicles and component parts, such as airbag inflators, with the Inflator Defect were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law.

208.    The Class Vehicles and component parts, such as airbag inflators, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which these goods are used, because the Defective Airbags contain the Inflator Defect, leading to an unreasonable likelihood of serious bodily injury and death.

209.    ARC was provided notice of the airbag problems through internal investigations and by many individual letters and communications with the Vehicle Manufacturer Defendants or within a reasonable amount of time after ARC and the other Defendants issued the recalls and the allegations of the Airbag Defect became public. Moreover, ARC and the other defendants were aware of these problems long before Plaintiffs and the Class and had ample notice and opportunity to correct them.

210.    As a direct and proximate result of ARC's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT 3

### Negligent Misrepresentation

211.    Plaintiffs bring this claim on behalf the Nationwide Class under Georgia law, because, with respect to the facts and issues relevant to this case, there are no true conflicts (case-dispositive differences) among various states' law of negligent misrepresentation. In the alternative, if Georgia law does not apply, it is brought under the laws of the states where Plaintiffs and Class Members reside.

212.    ARC owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiffs and Class members because ARC knew or should have known of the Inflator Defect and the risks associated with the manifestation of the Inflator Defect. ARC also made partial disclosures regarding the safety of the component parts of the Class Vehicles, such as airbag inflators, while ARC either knew or should have known that these Class Vehicles possessed the Inflator Defect and failed to disclose its existence and its corresponding safety hazard. ARC was required to accurately describe the vehicle's air bag system in an easily understandable format and to disclose any necessary precautions regarding the proper positioning of occupants to ensure

maximum safety protection of those occupants within the owner's manual under 49 C.F.R. § 571.208 S4.5.1(f)(1).

213.    ARC negligently misrepresented and omitted material facts concerning the standard, quality, or grade of the component parts of the Class Vehicles and the existence of the Inflator Defect exposing drivers and occupants to safety risks. As a direct result of Defendants' negligent conduct, Plaintiffs and Class members have suffered actual damages.

214.    The Inflator Defect is material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. The Inflator Defect may cause the inflator to rupture and expel metal shrapnel that poses a threat of serious injury or death to occupants. No reasonable consumer expects a component part of a vehicle to contain a defect in design and manufacturing, such as the Inflator Defect, that can cause serious injury or death to consumers.

215.    Plaintiffs and Class members would not have purchased the Class Vehicles but for ARC's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles. Plaintiffs and Class members justifiably relied upon ARC's negligent false representations and omissions of material facts.

216.    As a direct and proximate result of ARC's negligent false representations and omissions of material facts regarding the standard, quality or grade of the Class Vehicles with the Inflator Defect, Plaintiffs and Class members have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## COUNT 4

### Unjust Enrichment

217.    This claim for unjust enrichment is brought on behalf of the Nationwide Class under Georgia law. If Georgia law does not apply, it is brought in the alternative under the laws of the states where Plaintiffs and Class members reside.

218.    ARC has received and retained a benefit from the Plaintiffs and inequity has resulted.

219.    ARC benefitted from selling Defective Airbags for more than they were worth, at a profit, and Plaintiffs have overpaid for the Class Vehicles as a result, and have been forced to pay other costs.

220.    It is inequitable for ARC to retain these benefits.

221.    As a result of ARC's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

**II.    State-Law Claims Against the Vehicle Manufacturer Defendants**

## COUNT 5

### Fraudulent Concealment

222.    Plaintiffs bring this claim on behalf of the Nationwide Vehicle Manufacturer Class against the Vehicle Manufacturer Defendants (as defined above) under the laws of Georgia. In the alternative, if Georgia law does not apply, it is brought under the laws of the states where Plaintiffs and Class Members reside.

223.    The Vehicle Manufacturer Defendants concealed and suppressed material facts regarding the Class Vehicles—most importantly, the fact that they were installed with Defective

Airbags containing the Inflator Defect and their resulting propensity to rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants.

224.    The Vehicle Manufacturer Defendants took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

225.    On information and belief, the Vehicle Manufacturer Defendants have still not made full and adequate disclosure regarding defects that exist in the Class Vehicles, and continue to defraud and conceal material information from Plaintiffs and the Class.

226.    The Vehicle Manufacturer Defendants had a duty to disclose the Inflator Defect because each Defendant:

a.    Had exclusive and/or far superior knowledge and access to the facts, and the Vehicle Manufacturer Defendants knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.    Intentionally concealed the foregoing from Plaintiffs;

c.    Were required to accurately describe the vehicle's air bag system in an easily understandable format under 49 C.F.R. § 571.208 S4.5.1(f)(1);

d.    Were required to provide any necessary precautions regarding the proper positioning of occupants to ensure maximum safety protection of those occupants within the owner's manual under 49 C.F.R. § 571.208 S4.5.1(f)(1); and

e.    Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations. These incomplete representations include representations made under with 49 C.F.R. § 567.4.

227.    These omitted and concealed facts were material because they would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer. Indeed, Plaintiffs and Class Members trusted the Vehicle Manufacturer Defendants not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

228.    The Vehicle Manufacturer Defendants concealed and suppressed these material facts in order to falsely assure purchasers and consumers that its vehicles were capable of performing safely as represented by the Vehicle Manufacturer Defendants and reasonably expected by consumers.

229.    The Vehicle Manufacturer Defendants actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost the Vehicle Manufacturer Defendants money, and it did so at the expense of Plaintiffs and the Class.

230.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

231.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of the Vehicle Manufacturer Defendants' concealment of, and failure to timely disclose, the serious defects in millions of Class Vehicles and the serious safety and quality issues caused by the Vehicle Manufacturer Defendants' conduct.

232.     Had they been aware of the Defective Airbags installed in their Class Vehicles, and the Vehicle Manufacturers Defendants' callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of ARC's fraudulent concealment.

233.     The value of all Class members' vehicles has diminished as a result of the Vehicle Manufacturer Defendants' fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

234.     Accordingly, the Vehicle Manufacturer Defendants are liable to the Class for their damages in an amount to be proven at trial.

235.     The Vehicle Manufacturer Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching the Vehicle Manufacturer Defendants. the Vehicle Manufacturer Defendants' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 6

### Breach of Implied Warranty of Merchantability

236.     Plaintiffs bring this claim on behalf of the Nationwide Vehicle Manufacturer Class against the Vehicle Manufacturer Defendants (as defined above) under the laws of Georgia. In the alternative, if Georgia law does not apply, it is brought under the laws of the states where Plaintiffs and Class Members reside.

237.    The Vehicle Manufacturer Defendants are and were at all relevant times merchants with respect to motor vehicles and sellers of motor vehicles.

238.    The Class Vehicles are and were at all relevant times goods..

239.    A warranty that the Class Vehicles with the Inflator Defect were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law.

240.    When Plaintiffs and the Class purchased or leased their Class Vehicles, the transaction contained an implied warranty that the Class Vehicles were in merchantable condition.

241.    At the time of sale and all times thereafter, the Class Vehicles were not merchantable and not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with Defective Airbags with the Inflator Defect that have a resulting propensity to rupture and expel metal shrapnel that poses a threat of serious injury or death to occupants.

242.    On information and belief, the Vehicle Manufacturer Defendants had notice of these issues by numerous complaints filed against them, internal investigations, and by the ongoing NHTSA Investigation into the Defective Airbags containing the Inflator Defect.

243.    As a direct and proximate result of the Vehicle Manufacturer Defendants' breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT 7

## Negligent Misrepresentation

244.    Plaintiffs bring this claim on behalf the Nationwide Class under Georgia law, because, with respect to the facts and issues relevant to this case, there are no true conflicts (case-dispositive differences) among various states' law of negligent misrepresentation. In the

alternative, if Georgia law does not apply, it is brought under the laws of the states where Plaintiffs and Class Members reside.

245.    The Vehicle Manufacturer Defendants owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiffs and Class members because Defendants knew or should have known of the Inflator Defect and the risks associated with the manifestation of the Inflator Defect. The Vehicle Manufacturer Defendants also made partial disclosures regarding the safety of the Class Vehicles while the Vehicle Manufacturer Defendants either knew or should have known that the Class Vehicles possessed the Inflator Defect and failed to disclose its existence and its corresponding safety hazard.

246.    The Vehicle Manufacturer Defendants negligently misrepresented and omitted material facts, in owners' manuals, maintenance schedules, the § 567.4 Placard, or elsewhere, concerning the standard, quality, or grade of the Class Vehicles and the existence of the Inflator Defect exposing drivers and occupants to safety risks. The Vehicle Manufacturer Defendants misrepresented that they would remedy any defects under the express warranties but limited their coverage to mechanical defects. As a direct result of the Vehicle Manufacturer Defendants' negligent conduct, Plaintiffs and Class members have suffered actual damages.

247.    The Inflator Defect is material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. The Inflator Defect may cause the inflator to rupture and expel metal shrapnel that poses a threat of serious injury or death to occupants. No reasonable consumer expects a vehicle to contain a defect in design, such as the Inflator Defect, that can cause serious injury or death to consumers.

248.    Plaintiffs and Class members would not have purchased the Class Vehicles but for the Vehicle Manufacturer Defendants' negligent omissions of material facts regarding the nature

and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles. Plaintiffs and Class members justifiably relied upon the Vehicle Manufacturer Defendants' negligent false representations and omissions of material facts.

249.    As a direct and proximate result of the Vehicle Manufacturer Defendants' negligent false representations and omissions of material facts regarding the standard, quality or grade of the Class Vehicles with the Inflator Defect, Plaintiffs and Class members have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## COUNT 8

### Unjust Enrichment

250.    This claim for unjust enrichment is brought on behalf of Plaintiffs and the Nationwide the Vehicle Manufacturer Defendants Class under Georgia law. In the alternative, if Georgia law does not apply, it is brought under the laws of the states where Plaintiffs and Class Members reside.

251.    The Vehicle Manufacturer Defendants have received and retained a benefit from the Plaintiffs and inequity has resulted.

252.    The Vehicle Manufacturer Defendants benefitted from selling Class Vehicles for more than they were worth, at a profit, and Plaintiffs have overpaid for the Class Vehicles as a result, and been forced to pay other costs.

253.    It is inequitable for the Vehicle Manufacturer Defendants to retain these benefits.

254.    As a result of the Vehicle Manufacturer Defendants' conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

A.      An order certifying the proposed Classes designating Plaintiffs as the named representatives of the Classes, and designating the undersigned as Class Counsel;

B.      A declaration that the airbags in Class Vehicles are defective;

C.      A declaration that the Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

D.      An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Class Vehicles;

E.      An award to Plaintiffs and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, in an amount to be proven at trial;

F.      An award to Plaintiffs and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

G.      A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket expenses and damages claims associated with the Defective Airbags in Plaintiffs' and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defective Airbags;

H.      A declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Class

Vehicles, or make full restitution to Plaintiffs and Class Members;

    I.       An award of attorneys' fees and costs, as allowed by law;

    J.       An award of prejudgment and post judgment interest, as provided by law;

    K.      Leave to amend this Complaint to conform to the evidence produced at trial; and

    L.      Such other relief as may be appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.


DATED: September 21, 2022        **MOTLEY RICE LLC**
                           */s/ Kevin R. Dean*_____
                           Kevin R. Dean, Esq. (GA Bar No. 214855)
                           John D. O'Neill, Esq. (*pro hac vice* forthcoming)
                           28 Bridgeside Blvd.
                           Mount Pleasant, South Carolina
                           T: (843) 216-9000
                           kdean@motleyrice.com
                           jdoneill@motleyrice.com